United States District Court
Southern District of Texas
**ENTERED**
May 10, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONIA NWAORIE, on behalf of herself and all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-1406 |
| U.S. CUSTOMS AND BORDER PROTECTION, et al., | § § § | |
| Defendants. | § § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendants' Amended Motion to Dismiss (Doc. 58).  The court has considered the motion, the response, all other relevant filings, and the applicable law.  For the reasons set forth below, it is **RECOMMENDED** that Defendants' Amended Motion to Dismiss be **GRANTED**.

### I.  Case Background

Plaintiff filed this lawsuit alleging that the U.S. Customs and Border Protection ("CBP") violated the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, and the U.S. Constitution in connection with a seizure of currency on October 31, 2017.[2]

### A.  Factual Background

On October 31, 2017, Plaintiff went to Houston's George Bush

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 11, Ord. Dated May 21, 2018.

[2] See Doc. 1, Pl.'s Compl., p. 1.

Intercontinental Airport planning to fly to Nigeria to open a medical clinic.[3]  Plaintiff brought $41,377 in cash with her, carrying approximately $4,000 in her purse and the rest in her carry-on luggage.[4]

Plaintiff was about to board her flight when she was stopped by CBP officers on the jetway and questioned.[5]  Plaintiff was asked how much cash she was carrying.[6]  Plaintiff claims that she thought the officers were asking about the amount of cash in her purse and she responded that she had $4,000.[7]  Plaintiff was asked to fill out a currency declaration form and again reported that she was carrying $4,000.[8]  The CBP officers then searched Plaintiff's carry-on luggage and found the remainder of the $41,377.[9]  The officers seized the cash pursuant to 31 U.S.C. § 5317, which permits the seizure and civil forfeiture of funds traceable to a failure to file a currency transaction report.[10]

When Plaintiff returned to the United States, she was directed to a secondary border inspection and was subjected to "additional,

---

[3]   See id.

[4]   See id.

[5]   See id. p. 13.

[6]   See id.

[7]   See id.

[8]   See id.

[9]   See id.

[10]   See id.

2

particularly intrusive and invasive screening."[11]   During this screening, "CBP officers ransacked her luggage and emptied everything out of her bags."[12]  One officer slit open the bottom of Plaintiff's leather purse.  Another officer told Plaintiff that they were aware her money had been seized and that CBP would "follow her wherever she goes and subject her to this invasive treatment every time she travels internationally."[13]  Plaintiff complains that she will be subjected to additional screenings every time she travels internationally because she has been placed on a "screening list."[14]

On November 6, 2017, CBP sent Plaintiff a notice of seizure pursuant to CAFRA.[15]  The notice gave her until December 13, 2017, to: (1) request an administrative review of the seizure; (2) request a referral that a civil judicial forfeiture proceeding be filed; (3) make an offer in compromise; (4) offer substitute release of the seized property; or (5) abandon the property.[16]  The notice cautioned that, because currency was seized, Plaintiff must be demonstrate that the currency was derived from legal sources and

---

[11]   Id.

[12]   Id.

[13]   Id. p. 15.

[14]   Id. p. 42.

[15]   See id. p. 15.

[16]   See id. p. 15.

that its intended use was legitimate.[17]

On December 12, 2017, Plaintiff elected a referral for a judicial forfeiture proceeding under CAFRA and filed a CAFRA claim verifying her ownership interest in the seized cash.[18]  According to Plaintiff, CAFRA required the United States to initiate a judicial forfeiture within ninety days of Plaintiff's filing a claim.[19]  The United States failed to timely file a judicial forfeiture action.[20]

On April 4, 2018, CBP sent a letter to Plaintiff informing her that she could either sign and return the enclosed Hold Harmless Agreement ("HHA") within thirty days to obtain the return of her currency or CBP would initiate administrative forfeiture proceedings.[21]  The letter stated that if Plaintiff signed the HHA, a refund check would be mailed to her within eight to ten weeks.[22] The enclosed HHA provided that Plaintiff waived any claim to attorney's fees, interest, or any other relief related to the seizure of the property and that Plaintiff also agreed to hold harmless the United States and its employees from any lawsuits or

---

[17]    See Doc. 1-2, Ex. A to Pl.'s Compl., Currency Checklist p. 8.

[18]    See Doc. 1, Pl.'s Compl., p. 15.

[19]    See id.

[20]    See id.

[21]    See id. p. 17.

[22]    See id.

claims arising from the return of the property to Plaintiff.[23] Plaintiff chose to not sign the HHA, and, on May 3, 2018, she initiated this lawsuit on behalf of herself and other similarly situated persons.  The United States was served with this suit between May 10 and May 15, 2018.[24]

On May 3, 2018, without a signed HHA, the government initiated a refund of the $41,337 to Plaintiff.[25]  The check was issued on May 22, 2018.[26]

On October 23, 2018, Plaintiff traveled to Nigeria, and her outbound luggage was searched by "unknown government agents.[27]

In the complaint, Plaintiff sought return of the $41,377 alleging that it was seized and retained in violation of 18 U.S.C. § 983(a)(3)(B).  Plaintiff also brought claims directly under the Fifth Amendment for her alleged placement on a "screening list" that subjected her to more scrutiny at the United States border.

Plaintiff also requested that a class action be certified on behalf of herself and others who were injured by CBP's practice to condition the return of seized property on the execution of an HHA.

---

[23]     See id. p. 18.

[24]     See Docs. 7, 8, 9, 10, 12, 13, 14, 15, 16, Returns of Service.

[25]     See Doc. 26-1, Ex. 1 to Def.'s Mot. to Dismiss, Decl. of Celia Grau p. 2.

[26]     Id.

[27]     See Doc. 62-1, Decl. of Pl.  Plaintiff alleged that government agents failed to completely close a bottle of body wash that leaked and ruined much of her possessions.

In the class action, Plaintiff sought injunctive and declaratory relief that the HHA is ultra vires of CAFRA and 28 C.F.R. § 8.13 and therefore void and unenforceable. Plaintiff also sought class-wide injunctive and declaratory relief that the HHA violated the due process clause of the Fifth Amendment because it placed a condition on the return of one's property.

Pending before the court is Defendants' amended motion to dismiss. In the motion, Defendants argue that the court lacks subject matter jurisdiction over certain claims because they are moot or barred by sovereign immunity. Defendants also contend that other claims are not redressable under the Administrative Procedures Act ("APA"). As to the class claims, Defendants contend that they are not justiciable under the APA, the Declaratory Judgment Act or the United States Constitution and that Plaintiff is not an appropriate class representative because her individual claims have been resolved.

## II. Legal Standards

### A. Rule 12(b)(1) Motion to Dismiss

Pursuant to Rule 12(b)(1), dismissal of an action is appropriate whenever the court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), 12(h)(3). The party asserting jurisdiction bears the burden of proof to show that jurisdiction does exist. Gilbert v. Donahoe, 751 F.3d 303, 307 (5th Cir. 2014)(citing Ramming v. United States, 281 F.3d 158, 161 (5th Cir.

6

2001)).

The court may decide a motion to dismiss for lack of jurisdiction on any of three bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." <u>Ramming</u>, 281 F.3d at 161 (citing <u>Barrera-Montenegro v. United States</u>, 74 F.3d 657, 659 (5th Cir. 1996)). The court, in determining whether it is properly vested with subject matter jurisdiction, is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." <u>Krim v. pcOrder.com, Inc.</u>, 402 F.3d 489, 494 (5th Cir. 2005)(quoting <u>Montez v. Dep't of Navy</u>, 392 F.3d 147, 149 (5th Cir. 2004)).

**B.    Rule 12(b)(6) Motion to Dismiss**

Rule 12(b)(6) allows dismissal of an action whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts. <u>Harold H. Huggins Realty, Inc. v. FNC, Inc.</u>, 634 F.3d 787, 803 n.44 (5th Cir. 2011)(quoting <u>True v. Robles</u>, 571 F.3d 412, 417 (5th Cir. 2009)). The court may also consider, in addition to the complaint itself, "any documents attached to the complaint[] and any documents attached to the motion to dismiss that are central to the claim and

7

referenced by the complaint." <u>Lone Star Fund V (U.S.), L.P. v.</u> <u>Barclays Bank PLC</u>, 594 F.3d 383, 387 (5th Cir. 2010).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555. In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678.

## C.   **The CAFRA Process**

Federal law requires that any person who transports monetary instruments in an amount exceeding $10,000 into or from the United States must file a currency transaction report at a time and place prescribed by the Secretary of the Treasury. <u>See</u> 31 U.S.C. § 5316(a),(b). Pursuant to 31 U.S.C. § 5317, property involved in a violation of 31 U.S.C. § 5316 may be seized and forfeited in accordance with the procedures governing civil forfeitures in money laundering cases set forth in 18 U.S.C. § 981(a)(1)(A).

In 2000, Congress passed CAFRA, which fleshed out the procedures to be used in civil forfeiture proceedings initiated by the United States under the authority of 18 U.S.C. § 981. Pursuant to 18 U.S.C. § 983(a)(1)(A)(i), (ii), the United States is required to send a written notice of its intent to administratively forfeit property within sixty days of the seizure or initiate a judicial forfeiture proceeding within the same time period.

A person receiving notice of a seizure may file a claim of ownership of the property. See 18 U.S.C. § 983(a)(2)(A).The regulations require that upon filing a claim that meets the stated requirements, the seizing agency shall either return the property or transmit the claim to the appropriate U.S. Attorney for a commencement of judicial forfeiture proceedings. See 28 C.F.R. § 8.10(e). Once a claim is filed, the government has ninety days within which to initiate a judicial forfeiture. See 18 U.S.C. § 983(a)(3)(A). The applicable regulations provide that, if the ninety-day deadline is not met, the Attorney General shall notify the seizing agency. See 28 C.F.R. § 8.13(a).

If the government fails to initiate a judicial forfeiture or obtain a criminal indictment within the applicable time period, "the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General . . . ." See 18 U.S.C. § 983(a)(3)(B).

The regulations further provide that, "[u]pon making the

determination that the seized property will be released, the agency shall promptly notify the person with the right to immediate possession of the property, informing that person to contact the property custodian within a specified period of time . . . ."  28 C.F.R. § 8.10(e).  The regulation further states that the property custodian shall have the right to require presentation of proper identification or to take other steps to verify the identity of the person who seeks the release of the property.  Id.  Once notified that the seized property must be released, the seizing agency "shall promptly notify the person with a right to immediate possession of the property, informing that person to contact the property custodian within a specified period for release of the property.  See 28 C.F.R. § 8.13(b).

The United States is not required to return property for which it has an independent basis for continued custody, such as contraband or evidence of a violation of the law.  Id.  The custodian of the property "shall have the right to require presentation of proper identification and to verify the identity of the person who seeks release of the property.  See 28 C.F.R. § 8.13(c).  28 C.F.R. § 8.16 provides that the United States is not liable for attorneys' fees or costs in any administrative forfeiture proceeding, even if the U.S. Attorney declines to commence judicial forfeiture proceedings.

### III. Analysis

10

The court first addresses whether any part of this action is barred by sovereign immunity and then considers whether Plaintiff can state a claim under the applicable law and undisputed facts on her individual and class claims.

## A. Sovereign Immunity - Plaintiff's Claim for Interest

It is undisputed that Plaintiff obtained the return of the $41,377 within nineteen days of filing this suit. Citing Alvarez v. Smith, 558 U.S. 87, 92 (2009), Defendants argue that the return of the seized property moots Plaintiff's CAFRA and constitutional claims because she has obtained the return of the money, and, because she never signed an HHA as a condition precedent to the return of the money, she suffered no harm from CBP's request that she do so. Plaintiff counters that her claim is not moot because she has a legally viable claim for interest on the seized cash and therefore also may act as a class representative for others who were required to sign an HHA to obtain return of property.

The court starts with the proposition that Article III of the Constitution grants it the authority to adjudicate "Cases" and "Controversies." See Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013)(citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)). An "actual controversy must exist not only at the time the complaint is filed but through all stages of the litigation." Alvarez, 558 U.S. at 92 (internal quotation marks omitted). A case becomes moot if the dispute "is no longer embedded in any actual

controversy about the plaintiffs' particular legal rights." Id. at 93.

In Alvarez, the Supreme Court considered whether the return of seized property mooted a due process claim under 42 U.S.C. § 1983 by a claimant.  Id. at 90.  There, several individual plaintiffs challenged a State of Illinois law that authorized the warrantless seizure of movable personal property, such as cash and cars, and allowed the state up to 142 days to initiate a post-seizure judicial forfeiture of the property.  Id. at 91.  The plaintiffs sought a declaration that they were entitled to a prompt post-seizure hearing within ten days, a class action, and an injunction. Id.  The district court dismissed the action on the basis that the U.S. Constitution did not require any procedure prior to the initiation of the actual forfeiture proceeding and also refused to certify the class action.  Id.

On appeal, the Seventh Circuit reversed and remanded, holding that the forfeiture procedures showed "insufficient concern" for the due process rights of the plaintiffs. Id. at 91.  The Supreme Court granted certiorari to review the appellate decision.  Id. While on appeal, the State of Illinois returned the vehicles to several named plaintiffs, and the remaining named plaintiffs conceded that the state could keep the seized cash.  Id. at 92. The Seventh Circuit recalled its mandate.  Id.

Because the denial of the class action had not been appealed

12

to the Seventh Circuit, the Supreme Court was called upon to consider whether there was an actual controversy or an abstract dispute about the law after the individual plaintiffs' claims had been resolved.  Id. at 93.

Finding that the case was moot, the Supreme Court rejected the argument that this was a situation that was "'capable of repetition' while 'evading review.'"  Id.  The Court found that nothing suggested that the individual plaintiffs would be subject to the State's seizure proceedings in the future, and the capable-of-review doctrine applied only in the exceptional situation where a plaintiff can make a reasonable showing that he would be subject to the same illegal action in the future.  Id.

In Already, LLC, the Supreme Court considered whether a defendant could moot a case simply by ending its allegedly unlawful conduct once sued. Already LLC, 568 U.S. at 91.  The Court stated that a defendant claiming voluntary compliance "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 91 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)).

In the present case, Defendants have returned the seized funds, and neither party raises the likelihood that litigation over the $41,377 could arise in this or any subsequent litigation.  So, with respect to Plaintiff's $41,377, there appears to be no actual

controversy before the court.

Plaintiff disagrees and argues that she has a viable claim for interest owed to her for the time the seized funds were in the possession of the United States. However, this argument has been foreclosed by statute and subsequent case law.

It is well-settled that the United States, as sovereign, is immune from suit, and any waiver must be unequivocally expressed. United States v. Mitchell, 445 U.S. 535, 538 (1980); Boehms v. Crowell, 139 F.3d 452, 463 (5th Cir 1998). The Supreme Court has stated, "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." Spawn v. W. Bank-Westheimer, 989 F.2d 830, 832-33 (5th Cir. 1993)(quoting Library of Congress v. Shaw, 478 U.S. 310, 314 (1986)) .

Enacted as part of CAFRA, 28 U.S.C. § 2465 allows the imposition of interest in "any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails." See 28 U.S.C. § 2465(b)(1). Where currency must be returned to a prevailing claimant after the conclusion of civil forfeiture litigation, the United States is liable for "interest actually paid to the United States from the date of seizure." See 28 U.S.C. § 2465(b)(1)(C)(i).

The Fifth Circuit has held that Section 2465's fee-shifting and interest provision "applies only to civil proceedings to

14

forfeit property, that is, civil forfeiture actions initiated by the Government." United States v. Minh Huynh, 334 F. App'x 636, 638 (5th Cir. 2009)(unpublished).  The Huynh court found that the plain text of 28 U.S.C. § 2465(b)(1) did not apply to the plaintiffs' claim to set aside an administrative forfeiture of property and did not apply to another claim that the United States had voluntarily dismissed without prejudice.  See id. at 639.

Applying Huynh, the court finds that the interest provision of 28 U.S.C. § 2465 is only applicable when the United States initiates a judicial forfeiture and is not applicable here because this is not a civil judicial forfeiture action.  Sovereign immunity bars Plaintiff's claim for interest outside of a judicial forfeiture proceeding.  As Huynh forecloses Plaintiff's legal arguments on interest, the court need not discuss Plaintiff's arguments that rely on Sixth and Ninth Circuit law.

Plaintiff has obtained the return of the $41,377, and she is not entitled to interest, rendering her related claims arising from the seizure and forfeiture of the $41,377 moot.[28]  **B.  APA and Equal Protection - Secondary Border Screening**

The court next turns to Plaintiff's claim that her

---

[28]   As there is no live controversy concerning the return of the property, the following claims are now moot: that Defendants violated the provisions of CAFRA; that Plaintiff did not have sufficient notice of the currency reporting law; that the return of the currency was not "prompt;" that return of the property was unconstitutionally conditioned on the signing of an HHA; and that Plaintiff's due process rights were violated during the course of the forfeiture proceeding.

constitutional right to equal protection was violated when she was subjected to additional scrutiny by CBP agents when re-entering the United States.   Plaintiff seeks declaratory relief and an injunction removing her name from the list of persons subject to secondary border screening.

Defendants argue that Plaintiff may not bring an equal protection claim against the United States directly under the U.S. Constitution and that she has failed to state a claim upon which relief can be granted because CBP agents had a legitimate reason to subject Plaintiff to additional scrutiny at the border.

The United States is immune from suit except as waived by an act of Congress.   Rothe Dev. Corp. v. U.S. Dep't of Def., 194 F.3d 622, 624 (5th Cir. 1999).   A waiver as to injunctive relief can be found in the APA, 5 U.S.C. § 702, which permits a party "suffering legal wrong because of agency action" to file suit.[29]   However, the APA is inapplicable where the agency's action is "committed to agency discretion by law."   See 5 U.S.C. § 701(a)(2).   As neither party has made the argument that the challenged border search is non-reviewable, the court proceeds to consider Plaintiff's challenge to the CBP's action.

---

[29]    Although Plaintiff has invoked the Declaratory Judgment Act, 28 U.S.C. § 2201, as a jurisdictional source of relief in this action, it is well settled that the Declaratory Judgment Act is procedural only.   See Lowe v. Ingalls Shipbuilding, 723 F.2d 1173, 1179-80 (5th Cir. 1984).
    Because the court finds that Plaintiff may assert claims of constitutional violations within the confines of the APA, the court need not reach Defendants' alternative argument that Plaintiff may not bring a claim against the United States directly under the U.S. Constitution.

Under the APA, the court must affirm the agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)A). The courts have granted customs agents broad discretion when deciding to conduct routine stops at the border without a warrant because a sovereign has the right to control the persons and property that crosses an international border. See United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir. 1993)(citations omitted). This border search doctrine is also applicable to the "functional equivalent" of the border, that is, the point at which a person may practically be detained. See Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973). An airport where an international flight lands has been held to be the functional equivalent of the border. See Cardenas, 9 F.3d at 1147-48 (citing United States v. Klein, 592 F.2d 909, 911 n.1 (5th Cir. 1979)). A routine border search may be made without probable cause or any suspicion to justify the search. United States v. Sandler, 644 F.2d 1163, 1167-69 (5th Cir. 1981). Visual searches of vehicles, luggage, and personal effects like purses and wallets have been recognized as routine border searches. See Cardenas, 9 F.3d at 1148 n. 3 (collecting cases).

Courts have found the border search doctrine applicable to export searches for currency violations. See United States v. Roberts, 86 F. Supp.2d 678, 684 (S.D. Tex. 2000)(collecting cases). 31 U.S.C. § 5317(b) permits a customs officer to stop and search

any person entering or leaving the United States for violations of the currency reporting requirements.

Plaintiff's complaint that she was subjected to additional scrutiny at the border in 2017 fails to state a claim for relief under the APA as she has failed to allege any facts that would support a conclusion that the 2017 search of her luggage was arbitrary, capricious or in violation of the law.  To the extent that Plaintiff seeks to challenge the 2018 search of her luggage under the APA, she has failed to allege facts that would support a claim that the CBP's actions were arbitrary, capricious or in violation of the law in light of her admitted failure to declare a significant amount of currency at the border in 2017 when traveling to the same country, Nigeria.  The law allows CBP considerable discretion in its decisions to implement border searches, and the facts before the court fail to raise a fact issue of arbitrary, capricious or illegal conduct.

The Fifth Amendment incorporates equal protection principles that are applicable to the United States.  See United States v. Windsor, 570 U.S. 744, 774 (2013)(citing Bolling v. Sharpe, 347 U.S. 497, 499-500 (1954)).  In order to state a claim for violation of a right to equal protection, Plaintiff must allege that she was treated differently than other similarly situated individuals.  In the absence of an allegation that she is a member of a suspect class, the court must apply the rational basis standard of review.

See Lindquist v. City of Pasadena, Tex., 525 F.3d 383, 387 (5th Cir. 2008).

Under this standard, a legislative classification must be upheld in the face of an equal protection claim if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." See F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993); Glass v. Paxton, 900 F.3d 233, 244-45 (5th Cir. 2018).

Here, Plaintiff complains that she was treated "differently from and worse than, similarly situated international travelers who are U.S. Citizens and who have not been charged with any federal crime, nor had any property forfeited for any alleged violation of federal law."[30]  She also complains that a year after the seizure of the $41,377 in currency, she was subjected to another border search of her luggage in October 2018.[31]

Contrary to Plaintiff's assertion, Plaintiff is not similarly situated to the U.S. Citizen traveler who has not run afoul of currency export laws because, as set out in the complaint, she attempted to export over $41,000 in currency from the United States without declaring her possession of the currency on a currency transaction report.  And, once reminded of this legal obligation and provided the appropriate form on which to make a truthful and

---

[30]   See Doc. 1, Pl.'s Compl. p. 41.

[31]   See Doc. 62-1, Decl. of Anthonia Nwaorie p. 1.

complete declaration by customs officials, Plaintiff omitted $37,000 from her declaration. These undisputed facts provide a rational basis for CBP's action to subject Plaintiff to a secondary inspection. Plaintiff has alleged no facts that would call into question the government's decision to subject her to a secondary inspection. The fact that the government opted not to criminally charge her with this conduct and returned the currency to her does not undermine the underlying fact that Plaintiff failed to file a required currency report on $37,337 in cash that she placed in her carry-on luggage. After setting forth facts in her complaint that concede that she failed to file a currency transaction report on a significant amount of cash, Plaintiff cannot make the factually unsupported conclusion that she is similarly situated with those travelers who have not violated the law. Plaintiff has failed to allege an equal protection violation.[32]

In the absence of a viable equal protection claim based on a past search, the court also finds that she has failed to state a

_____

[32] Because the court finds that Plaintiff has not alleged an equal protection claim based solely on her complaint, it does not consider the Declaration of Steven Scofield, Assistant Port Director of U.S. Customs and Border Protection who averred that CBP maintains a database known as TECS, which documents interactions of individuals at the border. See Doc. 58-2, Ex. B to Defs.' Am. Mot. to Dismiss Decl. of Steven Scofield p. 2. According to Scofield, TECS is not a "screening list," and CBP has not placed Plaintiff on a "screening list." Scofield does not deny that Plaintiff's encounter with CBP in October 2017 is contained in the TECS data base.
And, in light of the court's finding that Plaintiff has failed to allege an equal protection claim with respect to future border searches, it need not reach Defendants' argument that Plaintiff has failed to exhaust her administrative remedies with respect to her alleged placement on a "screening list."

claim for future violations of her equal protection rights.   See
Whitmore v. Arkansas, 495 U.S. 149, 158-59 (1990)(holding that
allegations of possible future injury are insufficient to confer
Article III standing and a threatened injury must be "certainly
impending").

## C.   **Class Action - Plaintiff as Representative**

Defendant has moved to dismiss Plaintiff's class claims on the
ground that her claims are moot.  Plaintiff counters that, because
at the time she filed the complaint the funds had not been
returned, she has standing to complain on behalf of other,
similarly-situated persons.

In County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991),
the Supreme Court considered the standing of named plaintiffs who
challenged the constitutionality of the timing of probable cause
determinations, each complaining that he was not afforded a prompt
probable cause determination on a warrantless arrest.  Id. at 48.
As the named plaintiffs eventually received probable cause
hearings, the defendants argued that the plaintiffs lost standing
to complain about the timing of the hearings and they could not
show that there was a likelihood that they would receive similar
treatment in the future.  Id. at 51.

Relying on Gerstein v. Pugh, 420 U.S. 103, 110-111 (1975), the
Supreme Court found that the fact that a class was certified after
the named plaintiffs had received probable cause hearings did not

moot the claims of the unnamed members of the class and proceeded to address the merits of the constitutional challenge to the timing of the probable cause determinations.  <u>Cty. of Riverside</u>, 500 U.S. at 51.  In doing so, the Supreme Court recognized that some claims are so "inherently transitory" that it would be impossible to rule on a class certification before an individual's claim became moot. <u>Id.</u> at 52.  The court finds that Plaintiff had standing at the time that the complaint was filed to seek class-based relief.  The court proceeds to consider whether Plaintiff has stated a claim for class-based relief.

**D.  <u>Class Action - Hold Harmless Agreements</u>**

In their amended motion to dismiss, Defendants argue that Plaintiff has failed to state a due process claim based on a CBP request that a claimant to seized property sign an HHA in order to close an administrative forfeiture proceeding and obtain return of her property.  Plaintiff argues that the imposition of the HHA requirement after the agency has determined to release the property is unconstitutional and ultra vires.

Plaintiff's claim is based on CAFRA's language that an agency "shall promptly release the property pursuant to regulations" if it decides not to initiate a civil judicial forfeiture proceeding within ninety days of the filing of a claim for return of the seized property.  <u>See</u> 18 U.S.C. § 983(a)(3)(A), (B).  Plaintiff

alleges that her claim was received by CBP on December 12, 2017.[33]
Based on this claim, the agency was required to refer Plaintiff's
claim to the U.S. Attorney for commencement of a judicial
forfeiture proceeding.  See 28 C.F.R. § 8.10(e).  If the U.S.
Attorney declined to initiate a judicial forfeiture within the
ninety-day period, then the regulations required that CBP promptly
notify the claimant of that fact and required that the claimant
contact CBP for release of the property.  Id.

Here, the ninety-day period expired March 12, 2018.  Upon
return of the file from the U.S. Attorney, CBP informed Plaintiff
on April 4, 2018, of its decision to remit the seized currency to
her in full.[34]  The letter explained that "by accepting this
remission decision, you understand that you are waiving any claim
to attorney's fees, interest, or any other relief not specifically
provided for in this manner."[35]  The letter further explained that
if she did not agree to terminate the forfeiture process by signing
the HHA within thirty days, CBP would initiate administrative
forfeiture proceedings.[36]  Plaintiff did not respond to this letter
and filed suit on May 3, 2018, within the thirty-day period.

The HHA contains three major terms.  First, a claimant

---

[33]   See Doc. 1, Pl.'s Compl. p. 15.

[34]   See Doc. 1-4, Ltr. to Pl. from CBP Dated Apr. 4, 2018.

[35]   Id.

[36]   Id.

releases all claims she may have against the CBP related to the detention, seizure and release of the seized property.[37]   Second, a claimant agrees to hold the United States harmless for any claim or lawsuit by another person involving the seized property.[38] Third, a claimant agrees to reimburse the United States for the expenses, attorney's fees and costs expended in enforcing the HHA.[39]

As discussed above, sovereign immunity does not permit reimbursement for damages, attorney's fees, interest, or other litigation costs arising outside of a judicial forfeiture proceeding.  See Huynh, 334 F. App'x at 639.  Therefore, that portion of the HHA that required Plaintiff to acknowledge a "relinquishment" of a claim for damages, interest and attorney's fees is more in the nature of an acknowledgment that such relief

---

[37]   The claimant "releases and forever discharges the United States, its officers, agents, servants, and employees, their heirs, successors, or assigns, from any and all action, suits, proceedings, debts, dues, contracts, judgments, damages, claims, and/or demands whatsoever in law or equity which I, my heirs, successors, or assigns, ever had, now have or may have in the future in connection with the detention, seizure, and/or release by the Customs and Border Protection of the above listed property."   See Doc. 1-5, HHA.

[38]   The claimant "agrees to hold and save the United States, its officers, agents, servants and employees, their heirs, successors, or assigns, harmless from any claims by any others, including costs and expenses for or on account of any and all lawsuits or claims of any character for or on account of any and all lawsuits or claims of any character whatsoever in connection with the detention, seizure, and/or release by the Customs and Border Protection of the above listed property.  See Doc. 1-5, HHA.

[39]   The claimant "agrees to reimburse the United States, its employees, or agents from any necessary expenses, attorney's fees, or costs incurred in the enforcement of any part of this agreement within thirty (30) days after receiving written notice that the United States, its employees, or agents have incurred them."  See Doc. 1-5, HHA.

cannot be obtained and is not a true waiver of a right actually possessed.  As the United States has not waived sovereign immunity for damages, attorney's fees, interest and costs incurred during an administrative forfeiture proceeding, that portion of the HHA is not an unconstitutional deprivation of property without due process of law.

The portion of the HHA which deserves some discussion is the indemnity/reimbursement provisions that required a claimant such as Plaintiff to agree to hold the United States harmless if another person filed a claim or lawsuit concerning the seized property after the United States released it to the first claimant. Plaintiff argues that CBP's request that an HHA be signed as a condition of the property's release is ultra vires because 18 U.S.C. § 983 makes release of the property mandatory.   A s mentioned earlier, a claim against an individual federal official based on his official actions amounts to an action against the sovereign and is barred by sovereign immunity.  Rothe Dev. Corp., 194 F.3d at 624.   Ultra vires is an exception to sovereign immunity.  See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689 (1949).  There, the Supreme Court upheld a district court's dismissal of the suit based on sovereign immunity but recognized that not all suits for specific relief may be deemed to be actions of the sovereign.  Id. at 689.  The Supreme Court found that where the statute that conferred power on a federal officer to

take action was unconstitutional or where the manner in which the powers were exercised was constitutionally void, sovereign immunity will not bar an action for injunctive relief.   Id. at 690. Therefore, to obtain relief under an ultra vires theory, Plaintiff must show that the imposition of an HHA is unconstitutional.

In Town of Newton v. Rumery, 480 U.S. 386 (1987), the Supreme Court considered when a waiver of future civil rights litigation is unenforceable.   There, a man was indicted for aggravated sexual assault.   Id. at 389.   After the complaining witness claimed she was threatened by Rumery, a friend of the accused's, Rumery was indicted for witness tampering.   Id.   Plea discussions, threats of civil litigation and other litigation posturing followed, the result of which was that the parties reached an agreement whereby the charges against Rumery were dropped in exchange for his agreement to forgo all civil actions.   Id. at 390-91.   Ten months later, Rumery filed an action pursuant to 42 U.S.C. § 1983 claiming that his civil rights were violated when he was arrested and falsely imprisoned for alleged witness tampering.   Id. at 391.

The Supreme Court considered whether such release-dismissal agreements were inherently coercive and per se unenforceable.   Id. at 393.   Finding that the agreements were no more coercive than plea bargain agreements where constitutional rights were routinely waived, the Court reasoned that a defendant's choice to enter into such an agreement may reflect a "highly rational judgment that the

26

certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." Id. at 394. The Court concluded that the possibility of coercion was no reason to hold the agreement invalid.   Id.

The Supreme Court also considered whether the agreement's waiver of future civil action violated public policy because of the public's interest in the vindication of an alleged deprivation of constitutional rights.  Id. at 394-95.  The Court acknowledged that the vindication of constitutional rights and the exposure of official misconduct were important public concerns but those concerns had to be balanced by other public interests such as the resources that are diverted by the filing of "marginal" or "frivolous" lawsuits and the time and attention spent by public officials on such claims.  Id. 480 U.S. at 395.  The Court stated:

> This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest.  To the extent release-dismissal agreements protect public officials from the burdens of defending such unjust claims, they further this important public interest.

Id. at 396.

Turning to the particular facts before it, the Supreme Court found that the agreement was voluntarily entered into by Rumery, there was no allegation of prosecutorial misconduct, and the dismissal/waiver of future litigation provision served a public purpose because it spared the complaining witness the embarrassment of testifying in both the assault and tampering cases.  Id. at 398.

27

The court has not located any decision directly addressing whether an HHA is unconstitutional in the CAFRA context. In Anoushiravani v. Fishel, No. CV 04-212-MO, 2004 WL 1630240 (D. Ore. July 19, 2004), the court confronted the constitutionality of an HHA request after a customs official seized musical instruments and compact discs based on an alleged violation of the Iranian Transactions Regulations. The plaintiff argued that his personal property was exempt under the regulations, but the customs official would only agree to release the property upon the signing of an HHA. Id.

Addressing the defendants' motion to dismiss, the court found that the plaintiff had sufficiently alleged a due process takings claim as there was no bona fide dispute between the parties and the HHA was not a tool of settlement but was a "possible violation of [the plaintiff's] Fifth Amendment due process rights." Id. at *10. The court assumed that the plaintiff had alleged a due process violation and proceeded to consider qualified immunity. Id. Key in the court's determination of a "possible" due process violation was its finding that the defendants "failed to afford [the plaintiff] any procedural protections preceding or subsequent to the alleged deprivation." Id. at *9.

But such is not the case here. CAFRA sets forth a procedure to be followed in the seizure and forfeiture of property that falls

within the bounds of a criminal forfeiture pursuant to 18 U.S.C. § 981, making the present facts distinguishable from <u>Anoushirvani</u> and placing the HHA squarely in the "tool of settlement" category.

In the present case, Plaintiff's constitutional argument hinges on the presumption that each class plaintiff is the undisputed owner of the seized property and must relinquish rights and assume indemnification obligations to obtain return of the property.  But the United States cannot make such an assumption because at that stage of the process, only a claim has been filed by the class plaintiff.  The actual ownership of the seized property has not been litigated in a forfeiture or remission proceeding and there may be others with claims to the property. The United States, having decided that it did not wish to pursue litigation to forfeit the property, seeks to release the property to the claimant upon the representation of ownership and the legal assurance that if the property is later found to be the property of another, the claimant will indemnify the United States.  This makes sense:  Under CAFRA, the property under seizure is in the possession of the United States based on the probable cause that it was involved in a predicate criminal offense.  In such a case, it is not uncommon for there to be persons with possessory interests, legal ownership, equitable ownership or lienor status in the same property.  When property is seized, the United States may be unaware of any other person who might have a claim or interest in

the property, and the claimant who had possession of the property may have a self-interest in failing to inform the United States of the existence of another person with a competing ownership or lien-holder interest.  In such a situation, it is prudent for the United States to seek an HHA to protect itself when it is releasing the property without a full inquiry into actual ownership.

The court concludes that Plaintiff has failed to state a claim for a due process violation based on the United States' conditioning the non-judicial release of seized property on the signing of an HHA containing an indemnification provision.  If Plaintiff did not wish to sign the HHA, she could have proved her ownership of the property in the administrative forfeiture proceeding.

**E.   Class Action - Prompt Release of Property**

Plaintiff also seeks a class action based on her claim that her property was not "promptly released" as required by CAFRA. Plaintiff's complaint fails to state a claim for that cause of action.

Courts have strictly construed CAFRA's ninety-day deadline, see United States v. One 2007 Harley Davidson Street Glide Motorcycle, 982 F.Supp.2d 634, 638 (D. Md. 2013)(collecting cases). The court could locate no case that has interpreted CAFRA's statutory language "promptly release" to equate to "immediately release" or "release within days."  In fact, the statute's

30

"promptly release" language is modified by "pursuant to regulations promulgated by the Attorney General" which indicates a clear legislative intent that subsequently enacted regulations may interpose conditions on the release of the seized property.

The applicable regulation, 28 C.F.R. § 8.13(a) "Return of Property," provides that after the ninety-day deadline has passed, the United States Attorney "shall immediately notify the appropriate seizing agency that the 90-day deadline was not met." After being notified that the U.S. Attorney had declined to initiate a judicial forfeiture, the seizing agency "shall promptly notify the person with a right to immediate possession of the property" to contact the custodian to arrange the release of the property. See 28 C.F.R. § 8.13(b). The custodian of the property has the right to require proper identification to secure release of the property. See 28 C.F.R. § 8.13(c).

When interpreting a statute, the court must look to the plain meaning of the statutory language. See Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990). By using the word "promptly," it appears that Congress expected the release of the property to be initiated without undue delay. The court finds that the plain meaning of "promptly" is "carried out or performed without delay." See Am. Heritage Dictionary (5th ed. 2011); see also Raymond Profitt Found. v. U.S. E.P.A., 930 F.Supp. 1088, 1100 (E.D. Penn. 1996)(finding that a legislative direction that water

31

quality standards be "promptly" prepared and published meant that Congress intended the agency to begin preparing and publishing the regulations without undue delay).

The court interprets "shall promptly release the property pursuant to regulations promulgated by the Attorney General" to mean that CBP had an obligation to release the property in conformity with the statutory regulations without undue delay.

The regulation required that the U.S. Attorney notify the CBP that it had declined to initiate a judicial foreclosure and then required CBP to send a letter to Plaintiff notifying her that there would be no judicial forfeiture and to contact the CBP to arrange for return of the property. See 28 C.F.R. 8.13(b). The three-week period that this process took is a de minimus delay and cannot form the factual basis for a class action on the issue of an alleged failure to "promptly release the property pursuant to regulations promulgated by the Attorney General."

While the April 3, 2018 letter to Plaintiff interposed a request that an HHA be signed prior to the release of the property and allowed an additional thirty-day period within which the HHA was to be returned, the undersigned has recommended a finding that this request was not ultra vires or unconstitutional. It therefore cannot provide the basis for a violation of the statute's "promptly release pursuant to the regulations" language.

The United States processed Plaintiff's claim for return of

the property on May 3, 2018, and the check was issued on May 22, 2018.  This time period raises no issue of undue delay.

Thus, under the undisputed facts in the complaint, supplemented by the United States' evidence concerning when it initiated and processed the return of Plaintiff's property, it appears that the United States began to take steps to promptly release the property as required by CAFRA after the ninety-day period elapsed.  Plaintiff has failed to state a claim for a class action based on the timeliness of the return of her property.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendants' Amended Motion to Dismiss be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 10th day of May, 2019.

33

_____

U.S. MAGISTRATE JUDGE